UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SC2006, LLC, | Case No.: 2:18-cv-02003-JAD-BNW |
| Plaintiff | |
| v. | **Findings of Fact, Conclusions of Law, and Judgment Following Bench Trial; Order Directing Further Briefing** |
| Arbor Agency Lending, LLC, et al., | |
| Defendants | |

Apartment-complex owner SC2006, LLC sued lender Arbor Agency Lending, LLC (and its alter-ego companies, including Arbor Commercial Funding I, LLC and Arbor Realty Trust) because it failed to provide SC2006 with a mortgage loan in time to pay off its debts.[1] Asserting that the parties had a contract and that Arbor had bound itself to issue SC2006 a loan, the property owner seeks punitive and compensatory damages for Arbor's breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, bad-faith lending practices, and negligent misrepresentation. Arbor counterclaims for attorneys' fees.[2] The parties have stipulated to a bench trial, submitting briefs and evidence for my consideration, and waiving any evidentiary objections. After considering the record and the parties' briefs, I find in favor of SC2006 on one of its breach-of-contract theories and Arbor's attorneys' fees counterclaim because Arbor was obligated to fully process its application for a mortgage. But I find in favor of Arbor on the remaining claims and theories, largely because the lender was not obligated to issue SC2006 the loan.

---

[1] ECF No. 14.
[2] ECF No. 23.

**Findings of Fact**

SC2006 owns and operates Southern Cove Apartments—a 100-unit complex in Las Vegas, Nevada. Realizing that existing loans on the property would come due by May 8, 2017,[3] SC2006 began negotiating with Arbor to secure an additional Fannie Mae loan. On February 22, 2017, Arbor "approved" SC2006's "request to process a mortgage[-]loan" application in an engagement letter.[4] This letter was not a promise to provide the loan, and it noted that approval of the application would "be subject to a complete underwriting review, site visit[,] and the [l]ender's loan committee approval."[5] Arbor also reserved the right to "cease" processing the application and terminate any "further obligations" to SC2006 if "any of the following occurs:"

> (i) Borrower fails to comply with any of the requirements of this Application and/or Arbor's requirements in connection with the application processing; (ii) substantial destruction or damage to the Property; (iii) a material change in Borrower's financial condition; (iv) discovery by Arbor of any material misrepresentation by Borrower in the Application or in any other submission of Borrower; (v) failure by Borrower to provide any information necessary to appraise the Property, underwrite the loan[,] or close the loan; or (vi) discovery by Arbor of any circumstances or fact relating to Borrower or the Property [that] could make the loan ineligible for sale.[6]

The parties agreed that the application would be "governed by and construed in accordance with" New York law.[7] And the agreement cautions SC2006 that while "Arbor has performed a preliminary review of the transaction," neither its provision of the application nor acceptance of the application fee "guarantee either Arbor's approval of the requested [l]oan or the subsequent

---

[3] ECF No. 45-3 at 58.
[4] ECF No. 46-1 at 2.
[5] *Id.*
[6] *Id.* at 7.
[7] *Id.* at 8.

issuance of a [c]ommitment."[8]  SC2006 also agreed that Arbor would be its exclusive "Fannie Mae DU Lender."[9]

Shortly after signing the letter, SC2006 began providing Arbor with the requested materials, including its completed application, information about potential guarantors for the loan, and $20,500 to cover application fees.[10]  In the application, SC2006 stated that (1) it and its principals had not been involved in a "workout" event, which could include "discounted payoff, debt relief, deferment of payments[,] or debt restructuring" and had not missed a mortgage payment or defaulted in the prior ten years; and (2) that the property had not "been the subject of any foreclosure, deed-in-lieu of foreclosure, bankruptcy[,] or discounted payoff immediately prior" to the acquisition of the property.[11]  A late-added guarantor, Steve Donia, also certified as much in a form he provided to Arbor.[12]

But this turned out not to be true—the borrowing parties had, in fact, been subject to a workout event in 2011.[13]  SC2006's misrepresentation first came to light on March 31, 2017, when a title report sent to Arbor's underwriters and counsel revealed that the borrowers had received a loan modification.[14]  Nonetheless, Arbor continued processing the application, scheduling site visits and requesting further information and documents, including additional

---

[8] *Id.* at 9.
[9] *Id.* at 8.
[10] *See, e.g.*, ECF Nos. 45-3, 48-23.
[11] ECF No. 46-1 at 11.
[12] ECF No. 45-3 at 117–23.
[13] ECF No. 46-5 at 7.
[14] *Id.*; ECF No. 48-1 at 45 ("I did receive a title commitment this morning[,] which included what appears to be an expired regulatory agreement.").

guarantors for the loan.[15]  In a May 3rd email, Arbor appeared close to finalizing the deal, stating that it was "prepared to move forward" once it had vetted those guarantors, including Donia, and received its due-diligence reports.[16]  But when Brad Casey, Arbor's chief underwriter, learned of the workout event around May 5th while reviewing Donia's documents, he determined that Arbor would not continue processing SC2006's application.[17]  On May 9, 2017, Arbor memorialized its decision "to discontinue the processing and underwriting of a mortgage loan" for SC2006,[18] requiring it to secure a belated loan from another company at greater cost.[19]

The fact of SC2006's prior workout did not itself pose an independent barrier to issuing the loan.  As Casey testified, the company had issued loans to applicants with prior workouts, and a workout event may have little impact on the viability of a property.[20]  Casey admits that, had SC2006 "disclosed [the workout], [he] would have been okay with it."[21]  Arbor's due-diligence reports and its underwriters, excepting Casey, also endorsed providing the loan, even after they had taken into account the borrower's prior loan modification.[22]  And the property's

---

[15] See ECF No. 46-11.  Arbor concedes as much in its briefing.  See ECF No. 45 at 1 ("[I]t was discovered that items 3–5 of Exhibit 'A' were misrepresented . . . .  Nonetheless, even after this discovery during the underwriting process, Arbor continued to process Plaintiff's Loan Application.").

[16] ECF No. 46-16 at 2.

[17] ECF Nos. 45-4 at 15 ("[Question:] When did you review that form?  [Answer:] I don't know the date, but it would have been around the time of loan committee . . . .  I don't review the deals until it gets close to loan committee."), 21 ("I'm the chief underwriter and responsible for making decisions about whether Arbor makes the loan or not."); 45-3 at 66, 100 ("This deal is being withdrawn.").

[18] ECF No. 45-3 at 72, 102.

[19] ECF No. 46-23.

[20] ECF Nos. 45-4 at 15; 46-3 at 17 ("We have issued loans to, you know, persons and entities that have had a workout.").

[21] ECF No. 46-3 at 27.

[22] Id. at 10; ECF No. 46-20.

appraisal amount indicated that it was sufficient to sustain the loan requested.[23] The problem was of trust, not qualification. Casey was deeply concerned by SC2006's misrepresentations, noting both in his testimony and in his emails at the time that "the borrower had two opportunities to disclose the workout event, and they failed to do that," so "there's no trust in the character of the borrower" to rely on "any of the diligence that had been provided."[24] So it was SC2006's non-disclosure, not the workout itself, that caused Arbor to discontinue processing the loan application.

## Procedural History

SC2006 sued Arbor for failing to process its loan application, to provide it a loan, and to refund its expenses, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, negligent misrepresentation, bad-faith lending practices, and alter-ego liability.[25] Arbor counterclaimed, seeking attorneys' fees.[26] The parties eschewed substantive motion practice and, after participating in discovery, stipulated to a bench trial on the briefs, submitting evidence for my consideration, waiving any objections to the admissibility of that evidence, and accepting a decision consistent with Federal Rule of Civil

---

[23] ECF No. 46-3 at 9–10.

[24] ECF No. 45-4 at 21. *See also id.* at 16 ("[Question:] If they had provided a reasonable explanation, would you have considered continuing the process? [Answer:] So I would not because they had not disclosed it on two separate occasions, in our loan application and in a disclosure on a Fannie Mae form that says we have not had any workout events."); ECF Nos. 45-3 at 68 ("I think for Brad is more the lack of disclosure and how he found out."), 80 ("Brad isn't willing to budge with these guys on the sponsor side citing lack of disclosure whether they knew about the rate mod or not."), 83 ("Brad and John Caulfield, our COO . . . can't get comfortable with the sponsor story behind the lack of disclosures throughout the process."), 100 ("Application and 6460s make no disclosure of the work out [sic] event.").

[25] ECF No. 14.

[26] ECF No. 23.

Procedure 52(a)(1).[27] SC2006's briefing indicates that it has abandoned its "claim" for "alter ego,"[28] given that alter ego is not a claim but a theory of liability. For its part, Arbor makes no mention of its "counterclaim" for attorneys' fees.[29] So I find in favor of SC2006 on Arbor's attorneys' fees counterclaim, decline to consider SC2006's "alter ego" claim, and cabin my substantive analysis to SC2006's claims for breach of contract, promissory estoppel, negligent misrepresentation, breach of the implied covenant, and bad-faith lending practices.

## Conclusions of Law

### I.   Breach-of-contract claim

"To state a claim in federal court for breach of contract under New York law," a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."[30] The parties agree that SC2006 adequately proved the existence of an agreement and its adequate performance,[31] but they disagree as to whether Arbor breached that agreement by declining to process SC2006's loan application and provide it with the expected loan. Arbor argues that it never promised to provide SC2006 with a loan and that it properly declined to process the application because Arbor both misrepresented that it had been subject to a workout and failed to provide necessary information to process the loan. SC2006 largely sidesteps whether Arbor was obligated to provide it with a loan, but it marshals considerable evidence that it submitted all required materials to the lender and that its misrepresentations were immaterial to its application. I find

---

[27] ECF No. 44.
[28] ECF No. 14.
[29] ECF No. 23.
[30] *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).
[31] ECF No. 47 at 1.

that Arbor breached the parties' agreement by failing to finish processing SC2006's loan application, but it did not incur liability for failing to provide SC2006 with a loan.

### A. Arbor's obligations under the agreement

Arbor's engagement letter only bound it to process SC2006's application, subject to certain enumerated conditions. "The best evidence of what parties to a written agreement intend is what they say in their writing."[32] Under longstanding rules of contract interpretation, "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole."[33] Here, Arbor agreed that "[a]pproval of the mortgage loan" would be "subject to a complete underwriting review, site visit[,]" and "committee approval," and that it could "cease" processing the application only in limited circumstances, which included its "discovery" of "any material misrepresentation" made in SC2006's application submissions, or because SC2006 failed to provide necessary information.[34] The lender also expressly reserved the right to deny the loan or a commitment.[35]

But SC2006 asks me to consider the May 3rd email as part of the parties' agreement, which it believes binds Arbor to providing the loan. Generally, parol evidence may not be introduced to alter the terms of an entire, integrated agreement, which is considered "the exclusive evidence of the parties' intent."[36] Where, as here, the agreement lacks a merger clause,

---

[32] *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (Ct. App. 1992).

[33] *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (Ct. App. 2014) (citing *Greenfield v. Philles Recs.*, 98 N.Y.2d 562, 569 (Ct. App. 2002).

[34] ECF No. 46-1 at 2, 7.

[35] *Id.* at 9.

[36] *Unisys Corp. v. Hercules Inc.*, 638 N.Y.S.2d 461, 463 (Sup. Ct. 1996); *Fogelson v. Rackfay Constr. Co.*, 300 N.Y. 334, 338 (Ct. App. 1950)).

7

"the court must determine whether or not there is an integration 'by reading the writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing.'"[37] SC2006 provides no reason or precedent, and I see none, to deviate from the terms of the parties' express contract.[38] But even if I did, Arbor's May 3rd promises do not indicate that it would issue SC2006 a loan. That email merely affirmed that Arbor would "move forward" with processing SC2006's loan application, subject to SC2006's guarantors having "satisfactory credit and background searches and good REO," and it "receiv[ing] all legal and [underwriter] due diligence."[39] This is entirely consistent with its obligations under the engagement letter and makes no mention of a promise to approve the loan, should SC2006 provide the requested documentation. Thus, under the explicit terms of the parties' agreement, Arbor was obligated to finish processing SC2006's loan application but not to provide SC2006 with a loan.

**B.    Arbor's breach**

Under the relevant and explicit terms of the agreement, Arbor could only "cease" processing SC2006's loan application if it discovered a "material misrepresentation" in the loan application or if SC2006 failed to submit necessary materials.[40] Arbor argues that it was permitted to abandon SC2006's application because the company misrepresented itself twice—stating, in its application and in a form submitted by potential-guarantor Donia, that it had not

---

[37] *Braten v. Bankers Trust Co.*, 60 N.Y.2d 155, 162 (Ct. App. 1983) (quoting *Ball v. Grady*, 267 N.Y. 470, 472 (Ct. App. 1935)).

[38] Neither party even mentions the parol-evidence issue.

[39] ECF No. 46-16 at 2.

[40] ECF No. 46-1 at 7.

8

been subject to a workout event. It also argues that SC2006 failed to submit certain documents, which it needed to finalize the loan application. Neither basis excuses Arbor's breach.

### 1. *SC2006's misrepresentation*

While SC2006 inaccurately reported that it had not been subject to a workout, its misrepresentation was immaterial. "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."[41] In a different context, the Supreme Court synthesized precedent on materiality in both contract and tort law, noting that "the materiality standard is demanding," and proof of materiality can include evidence that the defendant consistently refuses to perform based on similar misrepresentations.[42] That Court drew expressly on New York contract law in formulating this standard, which has long affirmed that materiality must go "to the very essence of the bargain."[43] Here, there is no evidence that the existence of SC2006's prior workout would have induced Arbor to deny the application. On the contrary, it appears the workout would not have mattered to Arbor's decision to issue the loan. Not only did Arbor's underwriters discount the impact of the workout event early in the process and issue numerous reports endorsing the loan application, but Casey himself concedes that "he would have been okay" with the workout had SC2006 "disclosed it."[44] Casey also testified that Arbor has had no problem issuing loans to

---

[41] Restatement (Second) of Contracts § 162(2) (2020).

[42] *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2003 (2016).

[43] *Id.* at 2003 n.5 (quoting *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400 (Ct. App. 1931)) (internal quotation marks omitted).

[44] ECF No. 46-3 at 27.

other parties with similar workout events.[45]  Thus, the workout event would "have had a negligible effect on the defendant's" decision and "cannot be said to be material."[46]

Arbor argues that the fact of the misrepresentation was itself material, and that it was within its rights to abandon SC2006's application because of its concerns that the borrower "was not truthful or forthright."[47]  But this misreads the parties' contract, which explicitly states that Arbor can only cease processing the loan if it discovers a material misrepresentation—not that it can end the process if it discovers any misrepresentation at all.  Arbor's reading, in fact, would render every misrepresentation material (as any lie undercuts the trustworthiness of its author), effectively eliminating the "materiality" component from the contract's language.  Because a contract "should be read to give effect to all its provisions"[48] and terms, I decline to adopt Arbor's interpretation and find that SC2006's misrepresentation about the workout event was immaterial on this record.  Again, while any misrepresentation could certainly support the lender's ultimate decision not to *issue* the loan,[49] an immaterial one cannot support Arbor's decision to *cease processing the loan application* under the explicit terms of the parties' agreement.

---

[45] *Id.* at 17 ("We have issued loans to, you know, persons and entities that have had a workout.").

[46] *Dunkin' Donuts, Inc. v. HWT Assocs., Inc.*, 581 N.Y.S.2d 363, 365 (Sup. Ct. 1992); *see also* 26 Williston on Contracts § 69:12 (4th ed. 2020).

[47] ECF No. 48-1 at 39.

[48] *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 6 N.Y.3d 371, 374 (Ct. App. 2006) (same).

[49] The parties do not address whether and under what conditions Arbor could choose to deny issuing SC2006 a loan.

### 2. *SC2006 did not fail to provide necessary information.*

Alternatively, Arbor argues that SC2006 failed to provide "timely" documents from guarantor Donia, which caused it to cease its efforts to process the loan application. For support, it cites two emails—one from SC2006's representative acknowledging that the deal fell through and one internal communication that states "we simply do not have a large chunk of what we need to lock or close."[50] The former does not support Arbor's position because it does not state the reason the deal went south. And the latter is superseded by later communications, all of which indicate that the sole reason Arbor refused to process the loan was SC2006's misrepresentations.[51] Arbor's interrogatory responses and Casey's testimony also confirm that missing information did not factor into its decision to cease processing the loan.[52] So I find that this post-hoc basis, devoid of support in the record, does not excuse Arbor's breach.

### C. Damages

Because SC2006 conflates Arbor's failure to fully process the application with its failure to provide the loan, the company has not effectively proven its damages. Generally, a party must provide proof of damages, and failure to do so "is fatal to a cause of action for breach of contract."[53] As noted above, SC2006 was not necessarily entitled to a loan. It was, however, entitled to be fully considered for a loan. While SC2006 has certainly provided evidence about

---

[50] ECF No. 45 at 2 (citing ECF No. 45-3 at 66, 98).

[51] *See supra* note 24.

[52] ECF Nos. 45-4 at 16 ("[Question:] If they had provided a reasonable explanation, would you have considered continuing the process? [Answer:] So I would not because they had not disclosed it on two separate occasions, in our loan application and in a disclosure on a Fannie Mae form that says we have not had any workout events."); 48-1 at 37 ("The underwriting review as to the borrower entity and the various individuals yielded concerns as to the supportability of the loan. Further, each review resulted in further questions and concerns and questions as to the complete transparency of facts and issues.").

[53] *Proper v. State Farm Mut. Auto. Ins. Co.*, 882 N.Y.S.2d 340, 340 (Sup. Ct. 2009).

the amount of money it incurred in defaulting on its prior loans before securing a new loan from a different provider,[54] it has failed to show how those expenses arise from Arbor's failure to fully process (and eventually decline to issue it) a loan. But since Arbor does not challenge SC2006's showing on this issue, I direct the parties to brief the issue of damages springing from the breach of the promise to process the application, rather than from the denial of the funding.

## II.     SC2006's remaining claims

In addition to its breach-of-contract claim, SC2006 also seeks to recover under theories of bad-faith lending practices, negligent misrepresentation, promissory estoppel, and breach of the implied covenant of good faith and fair dealing.[55] SC2006's trial brief on these claims is woefully deficient. In a single page addressing all four claims, it cites neither the record nor precedent, asserting instead that Arbor's "conduct is clearly lender bad faith, in violation of the promissory estoppel laws and constitutes a negligent misrepresentation along with a tortious breach of the implied covenant of good faith and fair dealing," as well as alluding to some sort of "tortious interference."[56] And neither party articulates which law applies to these claims, given that New York law governs only the parties' contract and its interpretation.[57] When, as here, a federal court sits in diversity, that court applies "state substantive law to state law claims, including the forum state's choice[-]of[-]law rules."[58] So applying Nevada law, I find that SC2006 has not established that it's entitled to recover under any of these theories.

---

[54] ECF No. 46-23.
[55] ECF No. 46 at 15.  Arbor proffers no specific defense to any of these claims.
[56] *Id.* at 16.
[57] ECF No. 46-1 at 8.
[58] *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 610 (9th Cir. 2010).

### A. Implied-covenant, promissory-estoppel, and fraud claims

SC2006 successfully chose to seek recovery under a breach-of-contract theory, thus nullifying its ability to recover for quasi-contract claims like promissory estoppel or for breach of the implied covenant of good faith and fair dealing. Under Nevada law, an implied-covenant claim requires evidence that a party "literally complied with" the terms of a contract, while "deliberately [contravening] the intention and spirit of the contract."[59] But when a party has shown breach of the express terms of an agreement, no claim for an implied-covenant claim may lie.[60] So too for quasi-contract claims like promissory estoppel, which, as the Ninth Circuit notes, "is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event [that] it fails to prove a breach of contract."[61] Given that SC2006's implied-covenant and promissory estoppel claims are based on identical facts as its breach-of-contract claim, I deny recovery under those theories.

SC2006's promissory-estoppel claim also fails because Arbor made no actionable promises independent of its contractual obligations. To prevail on a promissory-estoppel claim under Nevada law, a plaintiff must prove four elements: (1) the party to be estopped must be apprised of the true facts, (2) it must intend that its conduct will be acted upon; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) it must have relied to his detriment on the conduct of the party to be estopped.[62] Though the parties do not fully brief this issue, SC2006 bases its recovery for these claims on "Arbor['s] promise[] on May 3rd that it

---

[59] *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991).
[60] *Id.* at 923.
[61] *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984) (applying California law, which is substantially identical to Nevada law).
[62] *Pink v. Busch*, 691 P.2d 456, 459–60 (Nev. 1984).

13

would proceed forward with the loan if Steve Donia acted as the key principal and qualified."[63] But the record does not support this characterization of the May 3rd email, which merely states that Arbor is "prepared to move forward," subject to certain conditions, like receiving "all legal and UW due diligence."[64]  As I noted above, "mov[ing] forward" most reasonably means moving forward with processing the application, given that it had yet to be reviewed by the loan committee.  And the existence of conditions precedent to approval renders this promise more akin to a negotiation, which is insufficient to support a claim for promissory estoppel under Nevada law.[65]

SC2006's negligent-misrepresentation claim fails for similar reasons.  To establish a misrepresentation claim, the company must show "by clear and convincing evidence:" (1) a "false representation made by defendant"; (2) "defendant's knowledge or belief that its representation was false," which may be objective or subjective; (3) the defendant intended to "induce" plaintiff to rely on the misrepresentation; and (4) damages.[66]  But Arbor has not made any false representations about its willingness to continue processing the loan.  And SC2006 has marshaled no evidence demonstrating that Arbor knew or should have known that it had made any false representations.  In fact, the record demonstrates that Arbor planned to continue

---

[63] ECF No. 46 at 15.

[64] ECF No. 46-16.

[65] *See, e.g.*, *Duarte v. Wells Fargo Bank, N.A.*, No. 3:13-cv-00371, 2013 WL 5236565, at *2 (D. Nev. Sept. 16, 2013) ("Insofar as [p]laintiffs mean to imply a claim for promissory estoppel based upon Wells Fargo's continuation of foreclosure proceedings while negotiating a modification, Plaintiffs simply do not allege any promise by Wells Fargo to modify or forbear foreclosure but only ongoing negotiations."); *Gonzalez v. Bank of Am., N.A.*, No. 2:13-cv-00460, 2013 WL 3877708, at *2 (D. Nev. Jul. 24, 2013) (dismissing the plaintiff's "promissory estoppel claim based on her allegation that she reasonably relied on representations of the [d]efendant that a loan modification was under review and foreclosure would not occur.").

[66] *Barmettler v. Reno Air, Inc.*, 946 P.2d 1382, 1386 (Nev. 1998).

14

processing the loan until Casey discovered SC2006's misrepresentations, causing it to promptly terminate the relationship. So I deny recovery under this theory, as well.

### B.     Bad-faith lending practices

SC2006 does not clarify the grounds for its "Lender/Bad Faith"[67] claim, pointing to neither a statutory nor common-law basis for its requested relief. Arbor does not explicitly mention this claim at all in its briefing. Generally, Nevada limits bad-faith tort actions to "those cases involving special relationships characterized by elements of public interest, adhesion, and fiduciary responsibility."[68] "A lender owes no fiduciary duty to a borrower."[69] So I decline to find that SC2006 may recover for Arbor's unsubstantiated bad faith.

### Conclusion

Based on these findings of fact and conclusions of law, and with good cause appearing and no reason for delay, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

- **Judgment is entered in favor of plaintiff SC2006 against defendant Arbor on plaintiff's breach-of-contract claim as to liability only, and defendant's "attorneys' fees" counterclaim**. Defendant is liable to plaintiff for breaching its agreement to process plaintiff's mortgage-loan application. However,

- **Judgment is entered in favor of the defendant and against plaintiff SC2006 on plaintiff's claims for breach of the implied covenant, promissory estoppel, negligent misrepresentation, bad-faith lending practices, and "alter ego."** Defendant is not liable to plaintiff for failing to provide it a mortgage loan.

---

[67] *See* ECF No. 14 at 8.

[68] *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 263 (Nev. 1997).

[69] *Corchado v. BAC Home Loans Servicing, LP*, No. 2:10-cv-01860, 2011 WL 4573905, at *3 (D. Nev. Sept. 29, 2011).

IT IS FURTHER ORDERED that the parties are directed to brief the issue of damages for plaintiff's breach-of-contract claim.  **Plaintiff must submit its opening brief by April 21, 2021, and the remaining briefs will be due in accordance with the schedule provided in Local Rule 7-2(b).**  Plaintiff's failure to file a damages brief will result in a final judgment for defendant.

_____
U.S. District Judge Jennifer A. Dorsey
April 7, 2021